at all at balance versus United States Food and Drug Administration at all. Mr. Ethny for the at balance, Ms. Powell for the at belief. Morning Council. You may proceed. Thank you, Judge Rogers and may it please the court, Michael Edney for the Appellant Cigar Association. It's Scar Industry Associations. The Food and Drug Administration's final deeming rule is arbitrary and capricious because it set a hard deadline for thousands of cigar and pipe tobacco substantial equivalence reports without accounting for the need to tell manufacturers what those reports must contain. This is a problem. Can you talk about the forfeiture question on what you just said in your motion for summary judgment below? You said the FDA could have included these rules, I'm paraphrasing, but the FDA could have included these form and content rules in the final deeming rule six months later or three years after. So you seemed to say in your motion for summary judgment that the FDA did not have to include the form and content rules in the original final deeming rule. So how does that not forfeit your argument that the deeming rule was arbitrary and capricious for not including the form of content? Your Honor, I think that we stand by that statement and I think it's exactly right. We're not contending that the final deeming rule itself or on the same day as the final deeming rule, the FDA had to come out with the form and manner rule required by Congress. What we are saying is that the final deeming rule needed to set up a system that was sensitive for the need of that rule at some point. And how the final deeming rule created a problem was that it set a firm date without reaching conclusions about how the agency would get to the necessary point. So there were several different options that the agency had. One would have been to actually provide enough time for it to release this rule. Another would have been the key, the date, as it did with regard to certain registration requirements off of the release of an implementing rule. But by setting this firm date, the final deeming rule set up a system that is arbitrary and capricious. So why is this – to the extent that that was problematic, why wasn't your proper course to petition the agency to take action and promulgate the form and content rules that they have now issued in notice of preliminary rulemaking? Well, Your Honor, first of all, in the early days of this, we did almost precisely that. In consultations with the Food and Drug Administration, we urged it to delay the compliance date that it had set for substantial equivalence reports so it could issue this guidance. And Judge Walker, Commissioner Gottlieb, came out in 2017 and said, you know, the industry is exactly right about that, that the due date does need to be pushed back so we can get these foundational rules out that are necessary for the system. But we do not have an independent interest in the form and manner rule. I mean, that's not our problem. Our problem is that we have a firm deadline for putting these substantial equivalence reports in, and we don't have a final deeming rule. We don't have a form and manner rule yet. That's the essential conundrum that we find ourselves in, the injury to us. And why not just rely on the informal guidance from 2011? Your Honor, the informal guidance from 2011 isn't close to a substitute for the form and manner rule for a number of reasons. First of all, the FDA recognized right out of the gate that it was going to issue an implementing rule for 905J1, the form and manner rule. This is at page 257 of the Joint Appendix. It never purported to be a substitute for that. Second, it is about cigarettes. And I think the closest and finest point on this is at page 267 of the Joint Appendix. There, the 2011 guidance requires the reporting of so-called harmful and potentially harmful constituent testing for cigarettes. And it actually specifies a protocol for doing so that is particular to cigarettes. I get that from the briefing, and I'm pretty sympathetic to you on that point. I hope that the FDA will address that specific detail. But let me ask one more equivalence report question, if I can. It seems like some cigar and pipe tobacco makers have submitted substantial equivalence reports, and those reports have been approved, something in the ballpark of about 100. So my question to you is, how did they figure out what to put in their successful substantial equivalence report applications? Well, Your Honor, I think in all likelihood they guessed correctly. But I do want to put that number in some context. As of February 2021, we had 58 substantial equivalence reports granted. And you can see this at approximately page 566 of the Joint Appendix. That is of 3,137 cigar substantial equivalence reports filed. Almost all of those cigar substantial equivalence reports were filed with regard to products that came on the market after August 8, 2016. So they weren't already on the market, and they had the luxury of going through this technology process. Why can't the people who haven't had their applications granted just take a look at the 58 that were granted and then do what they did? Your Honor, I really don't think that that's any substitute for what the FDA is going to require of all cigars. Why not? Why not? Your Honor, there's no question that the granting decisions provide some information of the FDA's reasoning. But that reasoning is specific to the products in question, and it's just not generalizable. I think the agency itself understands this. That's why, when Commissioner Gottlieb reached this question, this is the inquiry that the deeming rule contemplated that they would look at it in 2017. He decided there were foundational generalizable rules that needed to be put in place for this system to function. He repeated that conclusion in 2019 and in the proposed rule. That's helpful, Mr. Edney, and I feel bad about monopolizing so much of your time, so I'm going to get out of the way. No, no, Your Honor. No, Your Honor. You can take all of it, as far as I'm concerned. We're here to answer your questions, not for me to give a speech. Do you have any other questions in this vein, Judge Walker? I don't. I don't. Thank you. Tell us quickly what other provisions you want to talk about, because I want to talk about two specific provisions. Which were you going to go to next? Your Honor, I was going to talk about the 905J1 requirement that Congress put out to put the deeming rule in place. Why don't you go ahead and do that, and then I'll ask you my two questions, okay? So, again, I think we have three problems with this system that was set up. First, the Family Smoking Prevention and Tobacco Control Act and 905J1 of the Act required the FDA that it shall prescribe the form and manner of these reports before they are due. Also, the agency carefully avoided an important aspect of the regulatory problem. And I would refer the Court to several aspects of the deeming rule where commenters are asking for this category-specific guidance, and the agency is very carefully avoiding the conclusion that what is out there is sufficient. Instead, it says it may issue this guidance later. And then, third, we have this issue with the departure for the system for cigarettes. And, Judge Walker, this in part goes to your question. Here in this situation, the cigarettes were treated very differently under the substantial equivalence process. Once they put a report in, they could stay on the market until that report was decided. And you can see this in the 2011 guidance at page 262 of the Joint Appendix. The FDA says this is going to be a good system because if new rules and guidance come out, you can supplement your reports. We can go back and forth to see if things are deficient. We don't have that luxury for cigars and tobacco. Instead, the agency set up a system where these products have to exit within a year of the report being issued. And so this back and forth, this collaborative process that might have addressed the lack of a rule with regard to cigarettes, it's just not available for our products. And in the final deeming rule, by imposing this hard 12-month limit, we believe the agency didn't adequately explain why we should be treated differently. Unless either of my colleagues has a question about that, I want to change the subject. Of course, we'll go wherever you want. Okay. So I want to ask you about pipes. You rely on the word, on the definition of the word component. But I'm curious to know what you think about what the district court said, which is the district court relied on the word part. And part is broader. Quote, any essential portion or integral element, which is clearly broad enough to include pipes, or even if not, at least enough to get us to Chevron 2. In which case, so what do you think about that? Your Honor, I think probably the best answer to this is at page 29,042 of the final rule, in the first column to the left. There, that's the passage where the agency tells us that pipe tobacco pipes are going to be regulated as tobacco products. And the agency there is not relying on the word part. It's relying on its definition of the word component. So I think this is a situation where the district court developed an alternative reasoning for the agency that it didn't rely on itself. I think we need to take the agency at its word that it was regulating pipes as a component of its tobacco product rather than as a part. If we are going to go down the road that the district court did, and I will say it did it very briefly, remember a part needs to be integral to the tobacco product itself. And this distinguishes pipes very much from cigarette paper. Can you smoke pipe tobacco without a pipe? No. Can you use pipe tobacco for any? There's some way to do it, but there are cigarettes that roll pipe tobacco in paper and people smoke them. We'll concede that for the most part pipe tobacco is smoked through wooden or plastic pipes. Doesn't that make it integral? Doesn't that make the pipe integral? No, I don't believe it does, Your Honor. And I think the distinction is that it's completely interchangeable. When pipe tobacco is sold, it's sold without regard to whatever pipe it's going to be used in. Many people have had these pipes by their living room table for decades, and it doesn't depend on how that pipe works. And I would point the court to, again, the pages I cited from the final rule, 29,042. There, there is just absolutely no analysis for why pipes need to go through this pre-market review process, which is extremely onerous, and it's onerous for the most sophisticated tobacco companies. But I can tell you the people who make these pipes are not the most sophisticated tobacco companies. A lot of them are made out of homes and in shops by artisans. They're not used to an FDA drug approval process by any means. And we see no justification about why pipes are a problem, what features of wooden pipes are making pipe tobacco more or less dangerous. You didn't raise any of those arguments, right? Your only argument is that a pipe is not a component or part of a tobacco product. You haven't challenged anything else about the FDA's regulation of pipes, right? No, we have, Your Honor. Throughout the district court proceedings and in this court, we asserted that the FDA did not have a compelling policy basis for going after the regulation of pipes. It had discretion to exercise here. You know, after all, it had discretion to go after parts, components, and accessories. It drew a line, and we believe that line needs to be justified. And for something this substantial, it should have been done in more than just a sentence at page 29042 of the final rule. Well, look, let me ask you a broader question about that. I mean, I'm not sure the agency thought about it the way you did. But what we know is that the FDA has decided to regulate anything that will alter or affect the tobacco product's performance and not regulate things that won't do that, right? That's what the FDA has done. And if you look at it that way, it doesn't really make any difference whether it's a part or a component or accessory. The FDA had the authority to go along with it. That's the end of the matter. Is that the difference of any of this, Nick? No, I don't think it is the end of the matter, Your Honor. Just tell me why. For better or for worse, the agency relied on its authority to regulate components of tobacco products in order to reach pipes. And I think we need to take the agency at its word and hold the agency to its analysis. If it had gone through an analysis of saying, look, we have discretion over a wide range of matters that are related to tobacco products, and this is where we're going to draw the line, that would be one thing. Instead, it engaged in a statutory exegesis of what a component of a tobacco product is, and it made pains to distinguish it from accessories. In that context, I think we need to hold the agency to what it said. Now, if we decide its interpretation of the word component is arbitrary and capricious, there are other ways for the agency to get the pipes, no question. But the correct result is not for this court or litigation council to try to legislate around it. The correct result is to vacate that outcome and remand it back to the agency to engage in that reasoning in the first instance. So, yes, Your Honor, you're absolutely right. No, please finish. The panel said they had another question before my question. No, that's OK. I think you were going to ask about that, Judge Walker. I was going to ask about pipes, but I don't want to get in the way. Go ahead. I'm going to change my subject again, so go ahead and get your pipe question. I spent time for the first time in my life looking at tobacco seller websites where you can buy all this stuff. And sometimes they have a whole category called accessories, and that category includes pipes. And sometimes they have a whole category called accessories, but there's a separate category for pipes. They're not considered accessories. Does that suggest some ambiguity about whether or not a pipe is an accessory? I think it's fair to say, Judge Walker, that tobacco store owners probably don't engage in the type of careful parsing of words that agencies do when they interpret statutes and that courts do when they review those interpretations of statutes. Part of our inquiry to figure out if you win step one about your argument that a pipe is unambiguously an accessory and not a component is we look at the plain meaning, the ordinary, everyday meaning of what an accessory is. Your Honor, I think that's right. But remember, there's two issues here. One is whether it's an accessory, right? And I guess this practice that we've identified by looking at tobacco store websites suggests that some may regard it as an accessory and some may regard it as something else. I'm not hearing you saying that these websites classify it as a tobacco product. Rather, it has its own sui generis category on certain of these websites. But beyond that, it needs to fit within the definition of component for the FBA to win on its current reasoning. So just because in common parlance some people are not considering these accessories does not necessarily lead to the inference that those same people are considering them to be components. And that's the reasoning that the agency undertook. Okay. All right.  Well, you can go first. I'm fine. Okay. So I want to ask you about fees, user fees. Yes, exactly. Suppose, let's assume for a minute I agree completely with you that the statute's not as clear as the FDA thought, okay? There is an alternative justification in the ruling, in the justification. And they say, the agency said its interpretation results in a more predictable and less administratively burdened method here. Why is that sufficient to sustain it even if we agree with you that the statute's ambiguous? Well, Your Honor, I have several answers to that. First, this agency, even when it was pushing out its view that this is just easier to deal with and it's a policy convenience, was heavily relying on what Congress specified. And you can see that at page 28712 of the final user fee rule. In those circumstances, and the cases cited in our reply brief and opening brief demonstrate this, this court has not taken such claims of administrative convenience seriously or such alternative arguments. They still see that the agency's misconception. Can I just ask you to repeat? Could you just explain? I'm sorry. My internet was a little wobbly when you said that. What is it that you're pointing to? I mean, I take your point that if an agency's policy analysis, policy explanation is infected by a misunderstanding of a statute, we wouldn't defer to it. But what precisely do you think suggests that the agency's desire to develop a more predictive and simpler method is infected by its view of the statute as being unambiguous? What were you looking at there? I was looking at page 28712 of the final user fee rule where the agency is setting out this analysis. And it says that one of the reasons that we think this policy analysis is correct is because we think this is what Congress wanted us to do. I don't have the precise language in front of me, but I could get it to the court. But those paragraphs are infused with a sense of the agency's certitude about its statutory interpretation. So Congress says in this section that the secretary shall, in accordance with this section, assess user fees on. Then it goes on in the next subsection to say, here's how it shall be allocated. Here are the applicable percentages. List the following classes. And in reading this, I was thinking as a member of Congress, how could I have made this any clearer? It says, in accordance with this section, here's what the secretary is to do. And I read your briefs carefully, and I know you don't agree, but you haven't told me in taking these various phrases in the statute actually enacted by Congress why it's not clear. It says, do it this way, do it as to these classes, et cetera. What's unclear about that? It's not a question of, well, Congress could have said, do more, or whether the agency in its rulemaking could have done more. It's a question, you argue, that this particular provision of the statute is unclear. And I thought, what's unclear about it when you read it all together? Your Honor, I'm fully prepared to account for the phrase, in accordance with this section. And that's one part of the sentence. Another part of the sentence is that the Congress shall impose user fees on each manufacturer. I understand that. But it's saying, in accordance with this section. Yes. So for that language, the limit. I understand your argument. You can parse out and separate out phrases. But Congress didn't do that. It put them all together. And if you were the Secretary, how could it be unclear what Congress wanted you to do? Your Honor, I don't want to parse out that sentence at all. I do want to read it holistically. And I think it operates as follows. The sentence in its operative phrase has a statutory command to impose user fees on each manufacturer of tobacco products, subject to this section, which clearly includes e-cigarettes. It's introduced by the phrase, in accordance with this section. And I think the way that operates is, you know, is there a prohibition later in the allocation section that prohibits the imposition of user fees? I know, but you can do that only by ignoring the references to some sections that the Congress has stated. That's what's so troubling me about your argument. Not whether Congress made the right decision or not, but wasn't it clear about the decision it made? And, of course, Judge Cagle has said, even if you think it wasn't clear, the agency prevails at Chevron Step 2. Well, Your Honor, I would say this. We're perfectly prepared to account for the rest of the statute. And Section B-2 tells us how user fees are to be allocated. The key phrase is at the first paragraph that it says that they'll be allocated by the applicable percentage of each class, multiplied by the fees for the fiscal year. But then in the next section, subsection, which the government points to and the FDA points to, listing only six classes. And it says, for purposes of subparagraph A, the applicable percentages for a fiscal year of the following classes. And it lists six. Yes, and I think that word following is very important. It's a limiting adjective. It says the applicable percentage for the fiscal year for each of the following classes of tobacco products shall be determined in accordance with Clause 2. It doesn't say the applicable percentage for each class of tobacco products shall be as follows. It says for the following. So it deals with a subset, these six classes, and tells you how to determine the percentage for those six classes. It's not an answer that if we go to the Fair and Equitable Tobacco Reform Act, these percentages add up to 100%. Because this is perfectly capable once the agency fills the gap, which agencies do all the time and determines an applicable percentage for e-cigarettes, to use those percentages to deal with the relative percentages of the residual. As a matter of fact, that's exactly what Congress anticipated would happen in the case that some of these product classes hadn't been deemed yet. To go back to Judge Tatel's question, there is one thing that I wanted to say and I think it's very important to focus on. And it affects all of this. The FDA is very, very reliant on the fact that it would be hard to figure out what the applicable percentage should be for e-cigarettes. Why? Because there's all this data from other agencies and they've been calculating these percentages for a long time and we can rely on them and it keeps us out of this business. Well, that's just no longer the case. Congress can amend the statute, but apparently you were very persuasive telling Congress e-cigarettes, they didn't even exist at the time. So when Congress enacted this statute, it listed these six classes. If you want Congress to do more, go back. What we're talking about is what the Secretary was required to do. Your Honor, I don't think we had to persuade anybody in 2009 that e-cigarettes shouldn't be dealt with because the e-cigarettes really didn't exist in 2009. That's precisely my point. And yet you say this should be read to include e-cigarettes. Yes, because Congress left it open-ended. Congress said tobacco products subject to this chapter. What's missing is the word, and when it says the following classes shall be determined in accordance. And we mean no others. I mean, Congress, that's a level of specificity I don't even see Justice Scalia calling for. Your Honor, I do agree that the statute says the following classes shall be determined, but I don't agree that the statute says and there shall be no others. I agree, but if you want more, go back to Congress. No, I don't think that's right, Your Honor. You think the Secretary could impose them even though Congress hasn't authorized them? Congress not only authorized but mandated that the Secretary impose user fees on each manufacturer of tobacco products subject to this chapter. This tobacco product subject to this chapter goes all the way back to Section 901 of the Act, which doesn't just include the tobacco products that are in existence. It includes future tobacco products. And the only thing we're getting hung up on here is that B to A section of the statute. There it says the applicable percentage shall drive this, and the only thing the statute does thereafter is determine the applicable percentage for the following classes. And I do think that that word following is very important. It's a limiting adjective. It says we're telling you what to do with part of the problem, but not all of it. No, it says for purposes of subparagraph A, the following classes. All right? It seems to be very clear what Congress is saying. That's all it's saying there. That's all I'm getting at. Not that you may not be right in an industry sense, but here's what Congress wrote. And why isn't it reasonable for more than reasonable, why wasn't the Secretary required to conform to that language in imposing user fees? Your Honor, again, I disagree with your reading of that section. Again, it says for purposes of subparagraph A. Obviously, the specification of the applicable percentage for the following classes will be for purposes of subparagraph A. There is not language in B to B that suggests that Congress is exhaustively determining what shall be the applicable percentage. It's just for the following. I understand that. But at the time it was acting. All right? You can go back. I just don't understand what you are requiring Congress to say. You would require Congress to say, of course, if there are any future products that are developed, they should also be subject to the user fees. Well, Congress could have said that. It didn't. But it did say that the Secretary shall impose user fees on each manufacturer of tobacco products subject to this chapter. And that refers back to an earlier section of the Act that doesn't just refer to tobacco products then in existence in 2009, but refers to all products that are made or derived from tobacco. And as it turns out, the Secretary decided that e-cigarettes are among those. There is nothing in here that forecloses the Secretary from assigning an applicable percentage to such a new tobacco product. And to the administrative burden issue brought up by Judge Tatel, remember the agency's reasoning on why it would be easier for it not to deal with this situation is that other agencies, the Departments of Agriculture and Treasury, were gathering this data. That was true until 2015, when they got out of that business, because the Agricultural Subsidy Program that necessitated those calculations went out of existence. And now the FDA is making those calculations. And if you look at the broader user fee rule, including the cigarette rule that went into effect in 2014, the FDA is now collecting that data directly from the manufacturers. So, you know, extending the type of information that you would need from another set of manufacturers is not that much of an administrative burden. And it has enormous consequences. In the year before the deeming rule, in the year before this final user fee rule was issued, e-cigarette use had increased by 8,000 percent. There are 3,000 substantial equivalence applications pending for cigar products. There are 59,000 pre-market tobacco review applications pending for e-cigarettes. This is not a small problem. It is going to swamp the budgetary mechanism for the FDA on this, and the burden is going to fall on our industry. This incredibly unfair result is not one that's driven by the statute. The statute does not require this outcome, and the agency was wrong to conclude that it did. I see that incredibly over time. I have one very fast-standing question. Can you just tell me which client makes pipes or has standing to bring the pipes argument that you're making? I can tell from a quick look that a lot of your clients deal with cigars, but I didn't see any pipes. Yes. Several of the members of the trade associations, including the Cigar Association of America, including Cigar Rights of America, have divisions of their companies that manufacture pipes. Okay. That's all I needed. That was a challenge by the government, but we can provide that evidence if needed. I believe it's also a legitimate complaint. Thank you. Thank you. All right. Shall we hear from counsel for Appley? This is Lindsay Powell for FDA. I just want to step back for a moment to note that the deeming rule principally reflects a significant decision by FDA that cleaners are not challenging here, and that's the decision that products meeting the statutory definition of tobacco product should be subject to regulation. Before the deeming rule, products like cigars, like e-cigarettes, simply were not subject to regulation, and that is the central determination that FDA made in this rule. And as a consequence of that rule, products like cigars and pipe tobacco and e-cigarettes became subject to the statutory requirements set forth by Congress in the Tobacco Control Act, also to additional authorities provided to FDA by the Tobacco Control Act to impose additional requirements. But mostly what we're talking about here is one particular statutory requirement that automatically became subject to these products, cigars and pipe tobaccos, by operation of that underlying deeming decision, the decision that these products should be regulated at all. So when we're talking about premarket review and the substantial equivalence pathway, what we're talking about are requirements that were established by Congress, and that's something this court considered in a slightly different context than the NIFA pure decision, and it reached the conclusion that the government advocates here with respect to this cutoff date, the 2007 date for looking back to see what products are new tobacco products. And so NIFA pure is dispositive of that, but also its discussion more generally is helpful in underscoring the interaction between the rule and the statute here. So by operation of the rule, all these statutory requirements, including premarket review, all of these products became subject to the statutory requirements set by Congress. And so what we're talking about here, for plainness, several challenges, concerns just this one statutory requirement, the premarket review requirement and the substantial equivalence pathway in particular. For a little bit more context, I want to note that the substantial equivalence pathway is not the only premarket review pathway available to new products. It's certainly what we're focusing on here. But for products where that showing cannot be made, where there is no predicate product available, the statute provides another pathway. And so that'll be the pathway, for example, used by most e-cigarette products, since there isn't a predicate product that was marketed as of February 2007. So just as a practical matter, Ms. Powell, how would it work? I'm making a cigar. It's new. I think it's equivalent to a cigar that went off the market in, let's say, 2008. And I've got to run, I guess, lab tests to show that the harmful or potentially harmful components of my new cigar are no more harmful than that 2008 cigar. But those 2008 cigars are gone. They just can't be found. So how is it possible for me to run that test? Yes, Jonah. So there are several mechanisms that are available to a manufacturer in that position. And I think this underscores, just as an aside, underscores the wealth of resources and guidance that is available to manufacturers on this subject as they're preparing their substantial equivalence application. So if the original product isn't available for testing, if it was the manufacturer's own product, FDA allows it to just make a sample of that product, which may be easy enough to do in some circumstances. In some circumstances, that may not be easy. FDA has in those circumstances, and this is all set out in detail in a cigar specific appendix that's available on FDA's website and has been there since at least 2018, that provides all sorts of detail about substantial equivalence applications for cigar products. There's a separate one for pipe tobacco. And that explains the option of using a surrogate product so that if the manufacturer can identify a product that should test the same or very similarly to the actual predicate product, FDA has said that in those circumstances, the testing can be done on the surrogate product. That is helpful. And Mr. Edney has said that you took a collaborative approach with cigarettes that you're not taking with cigars. Can you respond to that? Are you being just as collaborative and lenient with cigars as you were with cigarettes? Or if there's a difference, why is there a difference? My understanding, Your Honor, is that FDA is absolutely taking the same approach with respect to all of these products and has been very inclusive of manufacturers in this process that it has sort of established. So he says that back when it was just cigarettes, if a cigarette submitted a substantial equivalence report application, they could keep their cigarette on the market until that application was either granted or denied. Is the same true for cigars? Substantial equivalent applications? There is a one year period. And again, all of this is subject to FDA. Why the difference? Why treat one differently than the other? So to my knowledge, there is not a difference currently between the treatment of cigarettes and cigars. I believe that this one year period would apply to anybody that had its application submitted by whatever the relevant cutoff date is. And then while FDA undertook its review during that one year period, there would be sort of a period of enforcement discretion where FDA wasn't doing it. What plaintiffs may be referring to is some of the timing that happened by operation of the Tobacco Control Act itself. So the Tobacco Control Act was enacted in 2009 and these requirements didn't become effective as to cigarette manufacturers until 2011. During that period, FDA was issuing guidance and working with those manufacturers. So some of this may just be by operation of who had to do what, when. But there's no special treatment here for cigarette manufacturers. Let me ask one more substantial equivalence question. The opposing counsel says something like 58 cigar applications have been granted. I remember reading one of the briefs. It's close to 100. It doesn't matter. Let's say it's 100. And he says today that there have been 3000 applications filed. It's a tiny fraction of the 3000 applications. Is that because those applications are applying for something that they're never going to get? Or is it because those applications are applying to prove an equivalence that exists, but the applications themselves fail to prove because they don't know what to include? Or is it just that the FDA is very slow? I can't break this down by number, but there are a number of different reasons why an application may not be authorized. And it's the second category, though, it's troubling. I mean, it would be right in terms of the legal challenge that the plaintiffs have brought. That legal challenge would be bolstered if the reason that only 100 out of 3000 applications have been granted is that for 2900 out of 3000, they simply don't know what form and content to include in the application. So there's no evidence that that's the basis for these. The majority of these applications having been not authorized, having been rejected. And I think it would be helpful here if I sort of step back and one point by point with respect to some of plaintiff's arguments on this, including what guidance is out there and what it says. But I think as an antecedent to that, I'd like to start with what the statute says. So our top line argument is that if you look at the text of this provision, which is 905J1, it does not direct the secretary to do anything. This is a provision that directs manufacturers to file a report. It's a mandate on manufacturers. And parenthetically, it says that that report shall take such form as the secretary shall prescribe. But that shall prescribe language is not a mandate on the secretary in any way. Even if you disagreed, even if you thought, no, that's really telling the secretary that she needs to do something, he needs to do something. The prescribed language is key. Prescribed doesn't say engage in notice and comment rulemaking. That's a very encompassing term that easily includes guidance and these other materials that FDA has been making available. And so even if you thought FDA had to do something, it's done that something here since at least 2011 when it issued this guidance. And this is one of the factual points I want to clarify. Plaintiff's counsel says that this guidance is cigarette-specific. And it's not. By its terms, it applies to the four enumerated products and any products that FDA deems. It's in no way specific to cigarettes. That's true of a number of the other guidance documents that FDA has made available. Some of these resources are product-specific in ways that specifically help the industries that are implicated by this litigation. As I noted, there are a number of industry-specific appendices available on FDA's website, one for cigars, one for pipe tobacco. There's also e-cigarettes, other products. And these really go through in great detail explaining what type of information is needed by FDA in these reports. It's true that FDA noted that it still gets reports that are of variable quality. So some of these reports do provide all of the information needed for FDA to determine whether a product is the same equivalent and others don't. And that was among the commentary that was made in 2017 and 2019 and among the reasons for the proposed rule with respect to those 2017 and 2019 statements. So I would like to draw the court's attention to that because they don't say what plaintiff's counsel says they do. You can see it, JA-126 and 294, what the commissioner and the agency actually said there. And however you read those, they don't say, this doesn't work without a rule. We need a rule to make this work. They acknowledge that a rule could be helpful, but there's a chasm between saying that the whole thing is defunct without a rule and saying that additional information for industry and the agency would be helpful. And it's the latter that these express. I do think with respect to the authorizations actually granted that even if you acknowledge that there may be a sense where the fraction isn't favorable, the absolute numbers are telling of the sufficiency of this guidance. So it's nearly 100 for cigars and pipe tobacco. Overall, it's over 1400 authorizations that FDA has issued. And again, we're talking about a generally applicable rule and generally applicable guidance. And over 1400 applications have found that to be workable, to be able to file these successful applications and get authorization. So I think that is telling of the problem. Notably, the district court in the American Academy of Pediatrics case, on which plaintiffs rely for other things, considered this argument on industry's part that they just couldn't get their premarket review applications together in a meaningful way without further guidance. And the court characterized that claim as disingenuous. But it too found no support for the idea that there just isn't enough to work with here. In addition to the other materials I've mentioned, FDA has been making available technical reports, which do have confidential information redacted as needed. And also the authorization orders so that industry can look at what has already been done successfully and build on that. And of course, they're welcome to talk to FDA. FDA has said- Can they access the 100 or so applications that have been granted? I believe so. Again, with appropriate information redacted. I think it's the technical reports and the orders themselves. Okay. Ms. Powell, I have cost-benefit questions, but I want to get out of the way in case there are other questions about this. Okay. Well, I want to continue on some subjects we were talking to counsel for petition on, or for plaintiffs. And I want to start with user fees, Ms. Powell. So I take your point that the statute includes a pretty detailed scheme for calculating user fees on specific products, which does not include e-cigarettes. I take your point about that. But the plaintiffs point to this phrase, each manufacturer and importer of tobacco products, subject to this chapter, that's clearly e-cigarettes. And they focus on the statute's purpose, namely to provide funding for the agency's regulatory activities. So, you know, I know you think your view of the statute is more persuasive than theirs, but I don't see how, given these competing signals, you can say this is unambiguous. So two principal responses, Your Honor. First, as a textual matter, there's one section I'd like to draw the person's attention to that hasn't been talked about in great detail so far today, which is subsection B1A. So this comes before the applicable percentage section, which lists the specific products we're talking about. Which one are we talking about? Hold on. Which one? We're talking about subsection B1A. B is involved? B is involved, yep. B1A. All right, so it's listing the fiscal year. The assessment, is that what you're talking about? Yes, and so subsection A under that. B2A or B1A? B1A. As in general, the total user fee assessed and collected under subsection A shall? Yes, so the total user fees assessed and collected under subsection A each fiscal year with respect to each class of tobacco products shall be an amount that is equal to the applicable percentage of each class for the fiscal year. Multiplied by the amount specified in paragraph one for the fiscal year. So paragraph one says, here's the total tie that we're dealing with. And then this section says exactly how we're going to cut it up. That you multiply that total, which is specified by statute, by these percentages that are also set forth by statute. And it refers to the applicable percentage. And then B, which we had talked about before, is applicable percentage. And this is just, it's a closed circuit. It's a closed-ended formula that Congress has provided. And I understand the point that now in 2021, it may feel like it doesn't make a lot of sense. But as was suggested earlier, that's really a question for Congress. What Congress was doing back in 2009 was figuring out how best and likely most administratively. I understand all that. I saw that. But the question here is whether this statute is unambiguous. That's the question. And it says, the statute says, subsection S.A. says, assess user fees on and collect such fees from each manufacturer and importer of tobacco products. And those are e-cigarette manufacturers, right? You don't disagree with that? I don't, but it says in accordance with this section. It says, yeah, but it says, it does say that. It shall do in accordance with this, it shall, that's the ambiguity of the statute. I totally agree with you that the phrase, the phrase, in accordance with this section, it brings in the whole section and supports the FDA issue. I get that. You're right about that. But then it says, assess user fees and collect them from each manufacturer of a tobacco product. That clearly goes the other way. So you've got, what you have here is ambiguity, not clarity. Particularly since, particularly given the argument about purpose, namely to provide funding for the agency's regulatory activities. And as counsel for plaintiffs just pointed out, and I'd be curious to your reaction to this, e-cigarettes are going to increasingly account for a huge amount of the FDA's regulatory activities. Which means everybody else will be paying for that, right? Yes, Jeremy, there's no question that the market for e-cigarettes is growing. And Congress has several times considered legislation that would do what plaintiffs want it to do. But that doesn't, those considerations don't, at this point in time, don't inform the meaning of the text of the statute. And I really think, Your Honor, I'm not sure, that's not the way we, respectfully, I don't think that's right. When we're looking to determine whether a statute is clear or not, we look at text and purpose, both, to determine whether there's clarity or ambiguity. And I agree with you that we don't look at the current balance in terms of how much e-cigarettes are consuming of the FDA's regulatory activities. I totally agree about that. But there's no doubt that the Congress passed this in order to provide funding for the FDA's regulatory activities, period. And, you know, you, the FDA, you could tell from my questions for counsel, for the plaintiff, that I, my instinct is that the agency's policy reasons for resolving this ambiguity may well be sustainable here. Although I have a question or two about that also. I just don't see the clarity the agency finds in the statute here because of this each manufacturer language. That's where I'm stuck. Yeah, and it does sound like I may or may not convince you of that. No, I didn't say you're not convincing. I just think it's really hard, and I'm not quite there. Yeah, if I may, I would make a few quick statutory points, and then I would like to address your own Chevron point, too. Before you do that, can I just ask you about this phrase? Tell me in the best, clearest way you can, the way I'm supposed to think about this, each manufacturer phrase. Tell me about that. What's your best explanation for that? I think each manufacturer there is really calling out the point that, so in accordance with the section in the calculations that Congress is prescribing that follow, it's to determine not only the share for each industry, but also the share for each manufacturer. But the terms manufacturer and tobacco products are defined terms in the statute. They are, yes. Yeah, and e-cigarette manufacturers are manufacturers of tobacco products. So you've got, in accordance with this procedure, they have to impose fees on a product that is a defined product under the statute. In other words, in accordance, here, maybe I'll put it this way, the phrase in accordance with this section can't limit the statute's definition of manufacturing tobacco products. No, but it can limit the direction to FDA in terms of how and with respect to whom it is supposed to assess user fees. And so I think, I mean, I think part of what's going on here is, on plaintiff's view, each manufacturer and importer of tobacco product ends up, if you give that the full scope that they insist on, a few things happen. One is much of the rest of the work that Congress has done here and much of what it has said becomes meaningless. In accordance with this section, no longer means very much. And certainly this very carefully prescribed series of calculations and allocations no longer means anything, because on plaintiff's view, FDA can just make the rest of it up. And it's not just making it up with respect to e-cigarettes, right? If you take each manufacturer and importer to mean what they say it means, you're talking about every manufacturer and importer of every single deemed product, including all components and parts, because those are deemed products. And you would also be talking about everyone in the supply chain, every single firm there. So you're talking about relabelers and repackagers. It's not just this group of manufacturers of these cigarettes and this sort of straightforward thing to figure out how to impose it on them. And even there, it's apples and oranges and complicated. But you're talking about so many other actors and manufacturers of so many other things. And to say, no, what Congress meant here was do this one thing very carefully and do whatever else you want with respect to the rest of it just renders the careful construction that's provided here largely meaningless. I mean, it really is a poor fit, I think. Sorry, Your Honor. No, go ahead. What's your response to my question then about to counsel for plaintiff when I suggested that I thought the agency's policy reasons might be perfectly acceptable here for explaining why it did what it did under an ambiguous statute? His response was the agency's argument that they did this for predictability and administrative workability just doesn't make any sense at all. So I think that's incorrect, Your Honor, for a large part of the reasons I've just said. So we're going back to the start of Your Honor's question. FDA did hear very clearly in the final rule say not only did it read the statute to require what it was doing, but that to the extent there was any perceived ambiguity, it really found this to be the only reasonable approach for these administrability reasons. And again, we have a statute here where Congress has used the pre-existing scaffolding of the Fair and Equitable Tobacco Reform Act. So this is an excise tax scheme, and e-cigarettes were not then, are not now subject to these excise taxes. And that's true for the other tobacco products. And so to sort of have that careful scaffolding on the one hand, we'll call those the apples, and have to develop wholesale the scheme for oranges to figure out how we're going to do calculations with respect not only to cigarettes, but all these other products, all these components and parts, all these other actors in the supply chain, is a hugely unwieldy process, and one that it would be very hard to make sense of as a matter of reason. Absolutely. Okay, one last question about this. I was struck by the fact that when I read your brief, I thought this was just, the agency was relying completely on its statutory interpretation. And then when I read the regulation, or the order, I saw that the regulation says, the order says that, you know, even if the statute's not clear, we have these policy reasons for doing it. In other words, they did it under Chevron, too. But you didn't say that in your brief. Are you not defending that here? No, we are defending that, Your Honor. I'd have to look at exactly what we said in the brief. I can tell you, I looked and didn't see it. So is there, I don't think I missed it. So I was thinking to myself, well, maybe the FDA isn't defending this rationality. No, I think the statutory analysis is more straightforward than Your Honor does, but we absolutely stand by the things said in the final rule and the reasonableness of FDA's approach, even if the statute were viewed as ambiguous. I did not recall that that was omitted from the brief, but to the extent it is, there's been no argument by plaintiffs that any argument along those lines has been waived, and we don't intend to do so. Okay. All right. Well, thank you. Those were very helpful answers. Thanks. I have another subject, but I'm going to pause for a while. Unless neither of you have any questions, I'll go ahead. I have one more subject, but Judge Rogers, I don't want to go before you if you have questions. Go ahead. If we could turn to the cost-benefit question issue. The plaintiffs say that FDA did not run a cost-benefit analysis specific to cigars and pipe tobacco. Is that right or wrong? That is wrong. Okay. Tell me where I look to see that that's wrong, and don't just say the whole 150-page analysis. Yes, Your Honor. And, of course, there's a sort of threshold that I won't belabor since it doesn't go to your question, but we, of course, do continue to think that the court shouldn't engage the cost-benefit analysis question because it's not subject to judicial review. But to Your Honor's question, if the court did reach that, it should conclude that the district court did, but the analysis here was adequate. The consideration of cost, which the agency found it was able to quantify, is, I think, looking at roughly AR 24006-21. And some of those pages are in the joint appendix. Some aren't. If the court wanted us to supplement, we would, of course, be happy to do so. But the FDA on the cost side, and it explained why it was treating costs different from benefits because one are more readily quantifiable here, and it used appropriate economic substitutes where it couldn't quantify. And are those costs specific to the substantial equivalent regime that cigars and pipe tobacco are now subject to, or are they more general than that? The FDA looked separately, and so also separately by product, because these tend to apply differently. At the PMTA, the other premarket review pathway, and at the substantial equivalence pathway, it looked at roughly how many cigar and pipe tobacco products were marketed as of 2007, how many were marketed. So you did. I think your answer is yes, and it's a good answer for FDA. The FDA's cost-benefit analysis considers the cost to the cigar industry of the substantial equivalence requirement regime. Yes. And same for pipe tobacco. And same for pipe tobacco, yes. Okay. Now, I don't want to interrupt you, but I do have different questions. Sure. I didn't know if you wanted to hear briefly about the benefit side, which was a little bit different. Please, and that's leading to my next question. But go ahead. You go first. Sure. So on the benefit side, the quantification was not feasible for the reasons FDA explained in the final RIA. But it did qualitatively explain the benefits of premarket review generally, substantial equivalence review specifically. And with respect to cigars and pipe tobaccos, you see that specific explanation actually in the preliminary RIA. In the final version, FDA sort of uses more of a shorthand, but it's clearly referring to this. And some JA sites for you in the final RIA, these sort of shorthand references are 501 and 503. But then I think where you'll see sort of a fuller explanation specific to cigars, pipe tobacco, hookahs, is at JA 525. And these explanations also overlap with the even fuller explanation of the benefits that are found in the preamble to the rule itself. And, of course, that discussion of benefits is not itself a cost-benefit analysis. FDA didn't rely on cost-benefit. But it explains how premarket review will keep more dangerous products from reaching the market and protect people that way. Okay. Let me get to my first concern was, like, what do the plaintiffs mean when they say this was not addressed at all? And I've got some reading to do, but assuming the reading says what you say the reading does, I'm with you on that. My other concern is JA 503, I thought, was the best of what I could find, the best explanation of the regulatory regime's benefits. It was the most specific, which is not to say that it was very specific. And I get that these benefits can't be quantified and that no court, and we have precedent on this, can require an agency to measure the unmeasurable. So put quantitative benefits out the window. And just to talk about qualitative, qualitative has to mean enough. It has to be more than zero, and it probably has to be more than just a teeny bit of benefits. And so I would, I suspect that the FDA would say that a regulation with $77 million in costs that stops zero people from smoking would be a benefit, would be a regulation with more cost than benefit. And I think probably you would say a $77 million cost would not outweigh the benefits of stopping just one person from smoking. And I get that you can't tell me exactly how many people will stop smoking from this. But I can't find in the cost-benefit analysis very much at all about whether I should think this is a teeny bit more than one person will stop smoking. This is a lot more than one person will stop smoking. And if it doesn't, it's just the benefits seem so invisible, so difficult to grasp, so indecipherable, whereas the costs seem quite clear. Why should I not think of it? Why am I wrong about the benefits? How about never start smoking? Yes, yeah, no, that's good. Yes, stop, let's get one person to never start smoking. But I think, let me start with this question, yes or no, because I rambled, and there are probably 100 questions in there. But let's say the $77 million cost is compared to a benefit of stopping one person from ever smoking. Do you think that the costs there, sorry, do you think that the benefits to that regime would outweigh the costs? I think likely not, but an important note here, Your Honor, which is that Congress didn't tell FDA in making this deeming decision to consider costs and benefits. That's a separate thing. You correctly said all of these questions about cost-benefit assume that the FDA had to do it correctly. And you argue in your brief they didn't have to do it correctly and that they could have ignored it and that we can ignore it. And the district court didn't quite agree with you. But I assume we're going to pay attention to it, assume the FDA had to do a cost-benefit analysis where the benefits of this outweigh the costs. I agree with you that the FDA would have failed the cost-benefit analysis if it had $77 million in costs and only stopped one person from smoking. How am I supposed to know that the FDA used its expertise to conclude that this regulation will stop more than one person from smoking? So three points, if I may, Your Honor. First, again, I think scope is relevant here. So this is not a premarket review rule. It's a deeming rule. The FDA was considering the costs and benefits of regulation as a whole. And I think that's really important when considering sort of the two sides of the scale that FDA is looking at. It's not just premarket review that it was considering. It's whether these should be regulated and everything that flows from that. So I think there's something a little bit artificial here about looking at this one question in isolation that's not consistent with the broader regulatory project. Second, FDA has explained in this rule and others why it's essentially impossible to predict how many lives or that's not quite right, how many people will either not start smoking or will stop smoking as a result of certain types of regulation. And this comes up in the warning regulations, other contexts. And so that's not what FDA has tried to measure because it doesn't make sense to try to measure the immeasurable. So that you won't find in the cost-benefit analysis something saying how many people specifically are likely to not start smoking or likely to stop smoking. What FDA did was use, since it couldn't quantify, couldn't come up with those numbers, what it did was use this break-even analysis, which the OMB circular is prescribed. And it asks what value, again, we're talking about the deeming rule as a whole, not premarket review, would have to have to. And it actually just looked at current smokers for that analysis, which I think is a very conservative approach because, of course, there's value to the people who will not start smoking, who will avoid some of the risks of secondhand smoke. But just looking at what current smokers would have to be willing to pay to justify the cost that it was able to quantify and it found that $2 per user. Right. So I read all that. Take a current smoker who now learns everything the FDA wants that smoker to learn and who nevertheless chooses to continue smoking. How has the FDA's regime been of a nickel's worth of benefit to that smoker, never mind $2 worth of benefit? In many ways, Your Honor. So with respect to premarket review in particular, even if a person continues to smoke, the products that will be available to that person may well be affected by premarket review. So the whole purpose is to prevent more and more dangerous products from coming to market. And we actually see that this is something Congress was specifically concerned with, that cigar and cigarette manufacturers historically have sort of incrementally recalibrated their products to refine the delivery of nicotine, to make them more addictive, to make them more harmful to users. And the premarket review process seeks to stop that. So it actually looks at what changes are being made to a product. It doesn't make it more harmful to the public health. And if it is more harmful. That is extremely helpful. I wish you had written the cost benefit analysis, but you have helped me very much in interpreting it. So I have no more questions. I'm happy to go over the court would like or I can make a judge table. I wanted to ask you about pipes. Could you could you just tell us. So what is your view about where the agency got its authority to regulate pipes? Yes, Your Honor. So a few things here. So the statute defines tobacco product and it does so in significant part by reference to part or accessory of such product that's right there in the statute. But it doesn't separately define those terms. And another. Correct. A gap for the agency to fill. So FDA was exercising its discretion in saying what that means. What is a component or part? What is an accessory? And contrary to what plaintiffs have said here today, FDA clearly and expressly and explicitly defined component or part. We're not just talking about pipes as components. The term is component or part. That's what FDA defined. That's what we're talking about here. And so Your Honor's points earlier about the breadth of the term part absolutely inform the scope of the statutory provision being interpreted and the reasonableness of the agency's definition here. And although it's true, FDA did not canvass the entire universe of products that could fall conceivably into either of these categories, that wouldn't have been wieldy. It did talk about many of them. It specifically noted that pipes are properly treated as a component because of their effect on use. And it analogized them to a refillable vaping pen. So that's like an empty e-cigarette device that you can add more nicotine containing e-liquid to. And that's certainly that device affects the way the user is consuming this product, the chemicals and nicotine delivered to them. So two pipes act that way. The size of the bowl can affect the rate of smoke that's delivered. If there's a filter in the pipe or not, that affects the component to the user. The size of the bowl can affect moisture, which FDA noted in the rule can affect nicotine delivery to the user. So there's all sorts of ways where this product that you can't use pipe tobacco without affects the way that pipe tobacco reaches the consumer and its effect on the consumer's health. And FDA did go through in the rule a number of other products that commenters found to present closer questions. And so I'd note that in addition to the sort of obvious analogies that we cited in our brief, refillable vape pens, the cigarette papers and filters that are mentioned in the statute, there are also things like a bag or tin for loose tobacco, which may less obviously be a component, but FDA explained very thoroughly in the rule why those sorts of containers, a bag or tin for the tobacco, an e-liquid vial, even the plastic covering for a single cigar, why those are properly regulated as components or parts, because they can affect in very meaningful ways the performance of the product inside. It can affect moisture again, which is relevant for the reasons I've noted. There can be an experience where chemicals from that container leach into the tobacco product and are then consumed by the user. FDA also noted that there were some instances where those containers were themselves being, that menthol was being applied to them for the purpose of mixing with the tobacco inside. So containers like that, the sort of mere vessels that plaintiffs would liken a pipe to, even though they're regulated appropriately as components and parts under the regulation, and that's not challenged here. So the conclusion that a pipe, which again, isn't considered to be used as pipe tobacco and affects the way it's chemical or delivered to a user is entirely appropriate. OK, that's very helpful. I just have my last question. It's just totally factual. Maybe there's an answer in here, but in preparing for this, my law clerk went and looked at something called Etsy. Do you know what Etsy is? No, Etsy, yes. OK, well, I actually didn't know. Anyway, he told me what it is, and he found 15,000 listings for tobacco, for 15,000 listings for tobacco pipes. So are, so if someone's just, you know, in their garage making pipes and selling them on there, are they subject to this statute? I believe so, Your Honor. If they're manufacturing a component or part of a tobacco product, then they would be subject to the regulation. They would have to get, they would have to apply under this statute, right? I believe so, and it may be that for some of these products, so I mean, pipes have been marketed for a very long time. So there will be readily available product kits for many of these, and it may be for a simple product like this. It may be very simple, right? It may not be much of a burden, I say. OK, well, thanks. I just didn't know. So I have no further questions, so. Judge Walker, did you want to follow up at all? Judge Walker? I'm sorry. No, I don't have any more. Thank you, Judge Rogers. All right. Thank you, counsel. Thank you. Counsel for appellant, give you a couple of minutes. Thank you. Thank you, Judge Rogers. Can you hear me now? Yes. OK, great. Thank you. I want to I want to go directly to an early question from Judge Walker regarding the 12 month period after filing a substantial equivalence report for cigar and pipe tobacco products and when the product needs to come off the market. This came about, Your Honor, through the proposed and final rule. In the proposed rule, the agency actually proposed treating cigars and pipe tobacco like it had cigarettes, allowing the products to remain on the market for indefinitely while the substantial equivalence report was considered. It changed that position in the final rule. The analysis there was that, well, we don't want dangerous products to remain on the market too long just because we're too slow. But there was absolutely no analysis in that change about whether the agency itself was ready to deal with this influx of reports and whether it had issued sufficient guidance. Ms. Powell says that although cigars and pipe tobacco may be subject to a less friendly regime now than cigarettes were when cigarettes were first regulated under the 2009 Act, that at least as of now, cigarettes, cigars and pipe tobacco are currently being regulated under the same rules, deadlines, etc. Is that correct? That is not correct. Where do I go to find that you're right, that she's wrong? We go to 905J2, I believe, of the Act. There, the agency, the Congress provided and the agency has followed and adopted that a product that submitted its substantial equivalence report within 22 months of the enactment of the statute could stay on the market as long as that report is pending. Now, you might think that that was a long time ago, Judge Walker, but the reality is that there are still cigarettes that were not grandfathered, that came on the market between 2007 and 2011 and had to submit this report for which the report is still pending and those products are still on the market. So it's cigarettes that came on the market after 2011 will be treated the same as cigars that come on the market, let's say, now. Yes, but I think it's important to treat apples to apples because there's two issues with the substantial equivalence regime. One is for, in the case of cigars, products that were on the market before August 8, 2016, and the other is for products that came on the market after. Products that wanted to come on the market after August 8 couldn't come on until they filed the substantial equivalence report and got FDA approval. They had to stay out. But we're dealing with here, and for cigarettes, this was a period of time that happened earlier, products that had long been on the market but didn't qualify for the 2007 grandfather date. For cigarettes, that was four years. For cigars and pipe tobacco, it was 10 years. And so for that large swath of products that have already been marketed, that where businesses have organized their lives around it, they had to submit substantial equivalence reports. The cigarette industry could come on and submit that report, let it stay there indefinitely while the FDA was considering it. The cigar and pipe tobacco industry had to submit the report by last September, and if we don't get a decision in a year, we have to come off the market. That's a decision that was made in the final deeming rule, and we believe that in combination with the failure to address whether the FDA was ready and whether guidance was ready to get us through that, that was an arbitrary and capricious, unexplained distinction that created this mess. And it is truly a mess, Your Honor, and I would direct the court to page 556 of the joint appendix. There we have the February 2021 report from the FDA's Center for Tobacco Policy. It, at that point, says that there is no way that it is going to get through the pending cigar substantial equivalence reports, the 3,000 that we talked about, by September 2021. And this is really the, this 12-month crunch was totally unnecessary. It wasn't explained by the agency, and it is the end of collaboration. And I want to come back to that. What happened after September 2020? Did these cigar people have to just take their products off the market? Did they take their products off the market? The way it works, and this date was moved a bit. It was in 2018, then it moved to 2020. But if you had, if your product came on the market between February 15, 2007, and August 8, 2016, you had to submit a substantial equivalence report by September 2020. And if you did, you could stay on the market for another year, and you could stay on the market if the FDA granted your report. If you did not, you had to come off the market. So those cigar products. In September 2021, we will know whether or not this kind of doomsday scenario you're describing has happened, where perfectly legitimate cigars are being taken off the market, simply because the one year, simply because the FDA took more than one year to respond to the application. Your Honor, respectfully, I don't think we have to wait until September 2021, because the agency is already telling us the answer. Again, at page 556 of the Joint Appendix in its February 2021 report, the Centers for Tobacco Policy is announcing to all of us that it is not going to get through these reports by September 2021. It has a bunch of excuses for that and reasons that we don't need to go into here, but the crash is coming. It's not a maybe, it's a definitely. Could it extend the date, the September date? Well, I mean, that's a great question, Your Honor. I think the agency, when it promulgated the deeming rules audit, could extend this date on numerous occasions. The deeming rule itself in numerous spots, page 29,008, 09, 010, 016, relies on its future flexibility to adjust these compliance dates. The District Court of Maryland said it was very wrong about that. It doesn't have that flexibility. It can do it through notice and comment rulemaking. No, Your Honor. It can't? But what the judge in Maryland also held, and this is a case that, you know, we were not permitted to be involved in, but what the judge in Maryland also held is that the ability to extend these dates is anchored by the effective date of the deeming rule. He said, look, you, the FDA, activated this statute in 2016. Once you did that, if you don't do this reasonably properly, if you keep pushing these things out, it's going to turn into post-market review, not pre-market review, although it already kind of was. That is a fundamental legal error that lies at the basis of the FDA's analysis of whether it had enough guidance out there. And it licensed the FDA to punt that issue, to say that we'd get to it later, to not completely run the ground whether the guidance were sufficient, and say that it may issue it in the future. And that's, combined with this 905J1 error, not making provision for this rule to get out before these reports were due, it shows that the agency was laboring under a legal misconception. And when that happens, we send rules back to the agency for it to make proper policy decisions on the basis of correct legal principles. And we don't speculate about what it would have done. Let me ask you, you may ultimately be correct, but suppose the problem is not the absence of the guidance that you say is necessary, but simply staff. Agencies inundated with these requests. There's 10 people assigned to review them. It's got 33,000 requests. Can't do it that fast. All right, now that doesn't take away your argument that the agency was arbitrary in thinking that it could. But that's a different issue, and I didn't see that addressed at all anywhere. Well, I think that is a component. Again, the issue in the deeming rule is not just whether to regulate products, it's when. Because nothing in the act said that the FDA had to regulate cigars, and it didn't tell them when it had to regulate cigars. As a matter of fact, it waited seven years to do so. But we think part and parcel of the deeming decision, part and parcel of the decision to throw it in the pre-market review, was a considered calculation of whether the agency was ready for it. And we are attacking one aspect of that, whether it has sufficient guidance out there. But its capacity to deal with this influx is an entirely different question. It plays into the grandfather date, too, because they pushed 10 years of cigars that were already on the market through this process where it could have focused on new ones. It could have staggered that review. All of these considerations weren't taken seriously by the FDA when it promulgated the final deeming rule. Instead, it said, you know, we'll address these issues later, and it's all going to be okay because we have the flexibility to adjust these dates. The district court in Maryland said no, and that legal error is driving a lot of these issues. But I do think that the guidance or the adequacy thereof is an issue because if you go back and look at the 2011 cigarette guidance, and I will assert to you that it is cigarette guidance. It refers directly to HBHC methodologies for cigarettes. But if you go back and look at that guidance, there's a suggestion, I think it's at page 262 of the joint appendix, where the agency said, look, this is all going to be okay because you can remain on the market as long as the report is pending. And we can go back and forth and make sure that you have enough in your report to get through. We're going to have a collaborative process. And that is exactly what happened. It took years and years and years for these cigarette reports to get through the process. The agency kept coming back to manufacturers and saying, well, we need this. Your report needs to be supplemented by that. That's not going to happen with regard to cigars, and the only reason it's not going to happen is because they set this 12-month exit date. And they shouldn't have done it. There's just no explanation for it, and it was arbitrary and capricious to do so, and it's creating the crisis that we're about to confront. I also want to go to a question that the counsel for the government addressed, that that's the adequacy of the guidance in question. Your Honor, State Farm tells us that we need the agency to be making these assertions that the guidance is adequate, not litigation counsel before this court. And that's never a conclusion that the agency reached. As a matter of fact, in the final deeming rule, carefully avoided it. After the final deeming rule, in a review contemplated by the deeming rule itself, the agency concluded time and time again that the guidance was inadequate for cigars and pipe tobacco. It did so in the 2017 press release. It did so in the proposed rule for the form and manner rule. It did so in remarks of the agency head in connection with the issuance of that rule. So I think at this point, we really can't dive into this assertion that there was enough out there for this process to go forward. It's not a conclusion that the agency made. It's a litigation argument. And State Farm tells us that we need to listen to the agency officials and what the agencies say or do not say in their rulemaking in order to reach these conclusions. We think that it's an issue that the agency should have reached in the final deeming rule itself. I also want to dissuade the court from taking up the invitation of relying on NICAPUR. That case was about e-cigarettes that go through a different premarket review pathway, don't have the 905J1 issue. All the arguments there about changing this process were about policy, and no statutory authority was offered. On 905J1 itself, the requirement to put out the form and manner rule, it's in the same sentence as the due date for the substantial equivalence reports, and it assumes by that due date that the agency will have already prescribed what the form and manner of these reports need to be. I want to come back, Judge Tatel, to a question that you asked me regarding pipes and where in the rule there is a suggestion that the policy determination relied on its interpretation of the statute. I would direct the court to the last paragraph in the third column of page 28711 of the user fee rule, continuing on to the first column there. There's a strong reliance on its previous statutory interpretation arguments, and if you see the last paragraph of page 712, there is an extensive discussion of the reason that they're not doing this is because Congress didn't tell them how to do it. Again, this is a responsibility now that the FDA has taken over. The user fee rule was about getting this information from manufacturers, and it certainly could do it with regard to e-cigarettes. It's a problem that could capsize the entire rule. With regard to cost-benefit analysis, I would invite the court to look at how the agency dealt with e-cigarettes in the premarket review process. It went through in the final regulatory impact analysis an extensive discussion of the precise problems with e-cigarettes, how their particular ones are endangering use, how the premarket review process was going to stop that. What we missed in the cost-benefit analysis with regard to cigars was any of that. Instead, there was a very significant focus on the – instead, there was a general discussion that says if there are unsafe products out there, we don't know what they are. It wasn't even an example. The premarket review process will root them out, and there was really no justification about throwing the last 10 years of cigar products that have long been on the market into this process. We can go back to this court's decision in RJR. The RJR decision about a half decade ago struck down the FDA's warnings requirements for cigarettes, and one of the things that happened in there was the FDA had gone through an analysis about how much its rule would change cigarette smoking, and the conclusion was 0.001 percent, and this court said, well, geez, that's not enough to make this endeavor non-arbitrary. After that happened, the FDA very consciously got out of the business of explaining how its regulation would reduce smoking rates because it didn't like the outcomes, and I don't think the FDA should be rewarded for getting out of that business. The cost-benefit analysis, which was explicitly relied on in the final deeming rule, is an effort to circumvent that important question that really should have been addressed by the FDA. I can see that I'm being abusive of the court's time, and I'd be happy to answer any questions that the court might have in addition to what I've just mentioned. Thank you. Any further questions? No, thank you. No. Thank you, counsel. Thank you, Your Honor. Under advisement.
judges: Rogers, Tatel, Walker